**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

JERRY ELROD :

Plaintiff, :

vs. : CA 15-00307-C

DOLGENCORP, LLC, :

Defendant. :

**MEMORANDUM OPINION AND ORDER**

A jury trial in this action commenced on December 12, 2016. After the Plaintiff rested his case and the Defendant informed the Court that it would not present any additional evidence in its defense, a motion for judgment as a matter of law (Doc. 51) was filed and arguments presented outside the presence of the jury. After consideration of the motion, the arguments of counsel and the evidence presented during trial, the Court informed counsel that a judgment as a matter of law would be entered on behalf of the defendant pursuant to Rule 50(a), Federal Rules of Civil Procedure. At that point, the jury was discharged and the trial adjourned.

## I. JUDGMENT AS A MATTER OF LAW

> Under Rule 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed.R.Civ.P. 50. We review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir.2004) (citing *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 148–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097; *see also*

> *Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir.1983) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony."). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097. "[I]f there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006) (internal citations and quotation marks omitted).

*Gowski v. Peake*, 682 F.3d 1299, 1310–11 (11th Cir. 2012). In other words, "judgment as a matter of law is appropriate only if the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010) (citation and internal marks omitted).

## II. DISCUSSION

### A. FACTS.[1]

After waiting out a hard rain on August 17, 2013, the Plaintiff, Jerry Elrod, decided that it was safe to travel to the Dollar General Store, located in Orange Beach, Alabama, to purchase furniture polish for his wife. The trip only took a few minutes since the store was approximately half a mile from his home in Orange Beach. The rain was just ending and even though when he parked his car his windshield wipers were still on, he did not need to use an umbrella from his car to the entrance of the store.

When he arrived at the store, he used the handicapped parking space and

[1] All trial evidence favorable to the position of the Plaintiff as well as any unfavorable evidence that the jury is required to believe has been reviewed in resolving the motion for judgment as a matter of law.

walked approximately 10-15 feet across wet pavement. During this walk, he did not notice any standing puddles of water because the parking lot was designed to slope away from the entrance and carry water into drain holes. Once he reached the sidewalk, it was covered by an awning, as was the storage area for the buggies used by customers. Wearing a favorite pair of his closed-toe sandals, he walked onto an outside rubber doormat and then stepped inside the entryway of the store onto a second cloth mat. He did not notice any accumulation of water on the sidewalk, the mats, or the floor of the store nor did he notice any wet floor warning signs. Without stopping to wipe his feet on the mat inside the store, he stepped from the second mat onto the floor of the store and immediately slipped and fell. There is no dispute that he slipped on a wet floor and a small dark skid mark made by his sliding shoe is visible on the videotape that was submitted into evidence. Without assistance, he was able to get up and continue his entry into the store. Upon getting off the floor, he felt that his calf was wet and, for the first time, saw two puddles of water on the floor approximately 12-16 inches in size. Plaintiff believes that accumulated rainwater from the mat caused him to fall.

This store was a fairly new Dollar General Store, having opened only approximately three months before Mr. Elrod fell. The store parking lot was designed to drain water away from the entranceway by sloping the parking lot. A 20 x 10 foot awning covered the entranceway and a portion of the outside sidewalk. It was also the practice of this store to keep two mats down at all times, one outside the entrance and one just inside. The Store's standard operating policies also included a requirement to inspect the entranceway at least three times per day for hazards that may create a danger to its customers. These

inspections were to include checking the mats for water accumulation and the condition of the floor around the mats, especially on rainy days when it would be expected that customers on their feet, buggies, umbrellas and other items that may have gotten wet from the rain, would bring in some water.

Plaintiff called three of the store employees as witnesses: the manager, Angela Spiller, Mary Kathleen Knipe and Keily Cruz. Cruz was the cashier stationed just 5-7 feet away from the entranceway and worked at cash register number one from 8 a.m. until the time of the fall, approximately 11:00 a.m. It was part of her job to greet customers as they entered the store and in performing that task, she was able to visually inspect the entranceway for potential hazards. She confirmed that it was a typical rainy day in Orange Beach on the day Mr. Elrod fell and that customers were tracking in water from outside. She testified that on such days it was the practice to mop the floor after every 10-20 customers but did not remember anyone mopping the floor where Plaintiff fell on that day. She believed that other members of the staff had checked the entranceway for hazards, including an accumulation of rainwater on the floor or the mats.

Plaintiff described his initial pain from the fall as being located in his hips but then he realized that he was suffering from pain in the left knee as well. He briefly leaned on a clothes rack and rubbed his left knee before continuing to walk about the store in search of furniture polish. He explained that, as a 62-year-old, he was able to lift himself up off the floor after tearing menisci and the ACL in his left knee because he must have been in shock and was embarrassed. Even though in pain, Plaintiff did not advise any of the staff that he had been hurt

from the fall nor did he request that they complete an incident report.[2] Even when asked by his neighbor, who happened to be in the store, if he needed help, he responded in the negative.

He continued to move through the store looking for furniture polish but was advised by an employee, Kathleen Knipe, that his brand was not in stock. During the conversation she had with him, he asked her if she knew that he had fallen. Plaintiff's testimony was that she responded by saying that she had put a sign where he had fallen, an action that was clearly recorded on the video recording of the incident. He did not ask her if she had mopped up the puddles of water that he saw after falling or change the mat that he considered to be saturated with water. His only suggestion was that she put up a warning sign. The video recording clearly shows that Ms. Knipe had an opportunity to mop up any puddles of water or change a saturated mat during the time she was setting up the warning sign. Her testimony was that she put the sign in place to appease Plaintiff and did not observe any puddles of water on the floor or a mat soaked in rainwater.

During the minutes that Plaintiff continued to look for furniture polish, he decided to buy some bacon. Although he was experiencing pain, he was able to walk about the store and complete his purchase. After completing his purchase, he was able walk to his car and drive himself home. It was not until he returned home that his knee began to swell.

Plaintiff and his wife remained in Gulf Shores from Saturday (day of fall) until the next Monday before returning to the Birmingham area. He did not seek

---

[2] An incident report was not completed until the store manager received a letter from Plaintiff's counsel.

medical attention but self medicated with Lortab that had been prescribed for his right knee.[3] By delaying his trip back to Birmingham until Monday to avoid the Sunday traffic, he was unable to see his orthopedic surgeon until Wednesday because she was occupied with surgeries on Tuesday. He sought no other medical care during the interim.

On August 21, 2013, Plaintiff went to see Dr. Martin for the first time after his fall. He complained of extreme pain, difficulty walking, and instability in his left knee. She asked medical history questions and performed an examination. Radiographs were obtained, an MRI was performed, and Dr. Martin completed an ultrasound exam to see if Plaintiff had sustained a quadriceps tear and to examine any fluid on the knee. Her review of the tests revealed a bone marrow edema (bruising through the bone), an ACL tear and meniscus tears. Subsequently, she performed arthroscopic surgery on the left knee on September 27, 2013. She completed a partial medial meniscectomy (removal of the torn portions of the meniscus) and a debridement of the anterior cruciate ligament (torn, loose and unstable portions of ligament shaved away). Plaintiff did not choose to undergo reconstruction of the ACL because he was not considered a good candidate for ACL reconstruction given his age and the overall condition of his knee.[4] Dr. Martin opined that, given the Plaintiff's age and the condition of his knee, a knee replacement could be expected in his future. Also, she opined that the ACL tear was the result of the trauma caused by the fall inside the Dollar

[3] Plaintiff was recovering from a surgical procedure to the right knee that was performed by Dr. Amanda Martin on July 11, 2013. He had been released by Dr. Martin but continued to experience some soreness in the right knee that caused a slight limp at times.

[4] Dr. Martin also injected Plaintiff's right knee with cortisone to treat his arthritis while he was under anesthesia because of his distaste for having to undergo knee injections.

General Store on August 17, 2013.

Dr. Martin's opinions were provided without the benefit of getting a complete medical history from the Plaintiff. Plaintiff failed to tell her about the diagnosis and treatment provided by Dr. Ryan Cordry, an orthopedic surgeon, between November 8, 2010 and January 21, 2011. He went to Dr. Cordry with complaints of knee pain. An MRI of the left knee, performed on November 8, 2010, revealed that Mr. Elrod had swelling in the left knee and tears in the posterior horn medial and anterior horn lateral menisci. Dr. Cordry's treatment records show that Plaintiff received knee injections and a prescription for Ambien. After Plaintiff's initial visit, he returned to see Dr. Cordry on January 21, 2011 and during that visit a surgical procedure on the left knee was tentatively scheduled for January 31, 2011. Plaintiff did not return for surgery because he lost faith in Dr. Cordry and decided that he did not need surgery at the time.

Plaintiff went to his third orthopedic surgeon, Dr. Darin Tessier, on January 7, 2015, over two years after surgery on his left knee.[5] Dr. Tessier's assessment was that Plaintiff came to him as a 64 year-old male with a history of a multiligamentous knee injury that required surgery. The x-ray results showed conditions that would require surgical intervention. They were what appeared to be lateral instability, the femur was translated with relation to the tibia and degenerative arthritis. Dr. Tessier determined that part of the lateral instability in the knee could have developed after the surgery performed by Dr. Martin. Mr.

[5] Dr. Tessier described Plaintiff as a handoff patient from Dr. Martin since she had moved back to her home state of Oklahoma. He was not able to review the notes of Dr. Martin before giving his testimony or the records from Trinity Medical Center. He was shown a copy of Dr. Martin's deposition.

Elrod had degenerative changes that Dr. Tessier described as lateral compartment arthritis (outside of knees were worn out) that would require intervention. It was also determined that he had arthritis under the kneecap, described as a fairly typical condition for a 64 year-old man.

At the next visit with Dr. Tessier, on March 24, 2015, Mr. Elrod underwent a total replacement of the left knee. A total knee replacement was recommended because Plaintiff had arthritis in more than one compartment of his knee and, given the issues with his kneecap, a partial replacement would not have been successful. Dr. Tessier opined, based on accepting Plaintiff's description of the trauma he suffered at the Dollar General store on August 17, 2013 as correct, that such trauma, to the extent that it would cause a meniscus and ACL tear, was sufficient to be classified as a multiligamentous injury that could accelerate the traumatic arthritic process. Dr. Tessier also testified that someone suffering the type and degree of trauma described by the Plaintiff would not be expected to be able to get up and walk around the store without assistance. The doctor was quite clear that, in his opinion, the tricompartmental changes shown in the MRI taken on August 22, 2013, five days after the fall at Dollar General, could not have developed in that period of time but would constitute a pre-existing condition. He also testified that arthritic changes to the degree found in Plaintiff's knee and meniscal tears commonly occur concurrently.

Faced with the clear evidence of preexisting conditions, *i.e.*, torn menisci and arthritis in the left knee, Plaintiff told the jury that he was not asking Defendant to pay damages for the condition of his left knee as it existed prior to the fall. Since Martin and Tessier were not informed of the entirety of Plaintiff's prior medical history with regard to his left knee, their opinions were obtained

without the benefit of that information. In addition, counsel for the Defendant was unable to fully cross-examine these treating physicians, especially as to their opinions on causation, because Plaintiff had not revealed a complete medical history of the left knee during the discovery period.

**B. THE LAW OF PREMISES LIABILITY**

There is no dispute that Mr. Elrod was an invitee of the Dollar General Store. *See Ex parte Mountain Top Indoor Flea Mkt., Inc.*, 699 So.2d 158, 161 (Ala.1997) ("'In order to be considered an invitee, the plaintiff must have been on the premises for some purpose that materially or commercially benefited the owner or occupier of the premises.'" (citations omitted)).

Recently, this Court has articulated a multifaceted and shifting analysis required under Alabama law where a premises owner is charged with negligence, as is the case here. That statement of Alabama law is comprehensive and governs this case. Therefore, Judge DuBose's opinion is quoted at length, including all citations, punctuation, parenthetical phrases, bracketed words and emphasis:

> "The well established rule is that an invitor owes a duty to an invitee to keep its premises in a reasonably safe condition and to warn an invitee of any danger about which the invitor has a superior knowledge or that is not open and obvious." *Waters v. Paul Enterprises, Inc.*, 130 So. 3d 1220, 1222 (Ala.Civ.App. 2013) (citations omitted); *South Alabama Brick Co. v. Carwie*, ___So. 3d ____2016 WL 1077265, at *5 (Ala. Mar. 18, 2016) (unreported opinion) (the "basis of an invitor's liability rests upon his superior knowledge of the danger that causes the invitee's injuries. If that superior knowledge is lacking, as when the danger is obvious, the invitor cannot be liable"). An invitor's "duty to warn extends only to hidden defects and dangers that are known to [the invitor], but that are unknown or hidden to the invitee." *South Alabama Brick Co.*, 2016 WL 1077265, at *5 (citations omitted). "The duty to keep premises safe for invitees applies only to the defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by

him in the exercise of ordinary care." *Waters*, 130 So. 3d at 1223; *South Alabama Brick Co.*, 2016 WL 1077265, at *6 (same). "All ordinary risks present are assumed by the invitee, and the [invitor] is under no duty to alter the premises so as to [alleviate] known and obvious dangers. The [invitor] is not liable to an invitee for an injury resulting from a danger that was obvious or that should have been observed in the exercise of reasonable care." *South Alabama Brick Co.*, 2016 WL 1077265, at *6 (citations omitted; emphasis deleted; bracketed text in original).

The invitor "has no duty to warn an invitee of open and obvious defects in the premises which the invitee is aware of, or should be aware of, in the exercise of reasonable care on the invitee's part." *Dolgencorp, Inc. v. Taylor,* 28 So. 3d 737, 742 (Ala. 2009) (citation omitted). "In a premises-liability setting", the Alabama courts "use an objective standard to assess whether a hazard is open and obvious.... [T]he question is whether the danger should have been observed, not whether in fact it was consciously appreciated." *Dolgencorp, Inc.*, 28 So. 3d at 741-42. The Alabama courts have applied the "no duty rule" when an inviter lacks superior knowledge of a danger such as when a condition was as known or obvious to the invitee as the inviter. *South Alabama Brick Co.*, 2016 WL 1077265, at *6. The duty "is measured by an objective standard, not the subjective state of the invitee's knowledge. The question is what was objectively reasonable for the invitor to expect the invitee to know.... [A]n invitor's duty before an accident is not determined by 'the invitee's subjective state of mind' at the moment of the accident." *Id.* (citations omitted). Also, whether the condition that caused Plaintiff's injury "was open and obvious is an affirmative defense, for which [Defendants] bear the ultimate burden of proof." *Dolgencorp, Inc.*, 28 So. 3d at 742.

Under Alabama law, the "focus of [ ] premises liability law is not on the care that may have been exercised by the invitee, ... but on relieving a premises owner of a legal liability where an invitee knew of the danger that caused the injury or should have observed that danger through the exercise of reasonable care." *Sheikh v. Lakeshore Foundation*, 64 So. 3d 1055, 1059 (Ala. Civ. App. 2010) (citation omitted). "[A]s a general rule, [invitor] is not liable for an injury to an invitee resulting from a danger which was known to the invitee or which was obvious or should have been observed by the invitee in the exercise of reasonable care, or from a condition which was as well known or as obvious to the invitee as to the invit[o]r, or from a danger which the invitee should reasonably have appreciated before exposing himself to it, or which the invit[o]r had no reason to believe would not be discovered by the invitee." *South Alabama Brick Co.,* 2016 WL 1077265, at *6 (bracketed text added).

> "A condition is 'obvious' if the risk is apparent to, and of the type that would be recognized by, a reasonable person in the position of the invitee.... A condition is 'known' if the invitee is aware of the existence of the condition and appreciates the danger it involves. Questions of openness and obviousness of a defect or danger and of an [invitee's] knowledge are generally not to be resolved on a motion for summary judgment.... Additionally, ... even though a defect is open and obvious, an injured invitee is not barred from recovery where the invitee, acting reasonably, did not appreciate the danger of the defect." *Waters,* 130 So. 3d at 1223 (citing *Ex parte Kraatz,* 775 So. 2d at 803-804) (internal quotations omitted). The "plaintiff's appreciation of the danger is, almost always, a question of fact for the determination of the [trier of fact]." *Waters*, 130 So. 3d at 1225) (bracketed text in original). However, Alabama "[a]ppellate courts have concluded that conditions may be 'open and obvious' as a matter of law in certain situations[.]" *Sheikh*, 64 So. 3d [1055,] 1061 [(Ala. Civ. App. 2010)] (citation omitted) (collecting cases).
>
> "Under Alabama law, the existence of a duty is a legal question to be determined by the court." *South Alabama Brick Co. Inc.*, 2016 WL 1077265, at *5 (citing *Wal–Mart Stores, Inc. v. Smitherman*, 872 So.2d 833, 837 (Ala. 2003)). "The existence of a duty is determined by a number of factors, including (1) the nature of the defendant's activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened." *Pritchett v. ICN Medical All., Inc.*, 938 So. 2d 933, 937 (Ala. 2006) (citation and internal quotations omitted). "The key factor is whether the injury was foreseeable by the defendant." *Id.* (citations omitted).

*Boniol v. PCH Hotels and Resorts Incorporated*, No. 15-0338-KD-N, 2016 WL 3365445, at **4-5 (S.D. Ala., June 16, 2016) (internal quotation mark omitted).

Very important to the resolution of this motion is the established law in Alabama that rainwater-based slip-and-fall cases are distinguishable from other slip and fall cases. See *Gulas v. Ratliff*, 216 So.2d 278, 281 (1968) ("A fall caused by snow or rain is distinguishable from a fall resulting from some other object as is usual in a slip and fall case."). When testimony in a case reveals that the plaintiff fell on a rainy day and was aware of the rainy conditions, it is generally held that "everyone is aware that, on rainy days, water splashes in and people track water inside of businesses. Thus, business invitees are aware or should be aware that, if

they enter a business on a rainy day, the floor could be wet and slippery." *Mendez v. Walgreen Co.*, No. 5:14-cv-01136-HGD, 2015 WL 3767218, at *3 (N.D. Ala., June 17, 2015); *see Katrensky v. United States*, 732 F.Supp.2d 1194, 1199 (M.D. Ala. 2010) ("The Alabama Supreme Court has repeatedly held that a reasonable person knows, or should know, that rain water causes surfaces to become slick, and thus, premise owners are generally not liable for slippery conditions caused by rain water."). Thus, the articulation of a business owner's duty on rainy-day-cases is altered significantly:

> [A]lthough a storekeeper owes a customer a duty to exercise reasonable care to maintain the premises in a safe condition, where the foreign substance is rain water tracked in by customers and in the absence of unusual accumulations, due care does not require that a storekeeper keep the floor completely free of water. When it rains, surfaces naturally become more slippery than usual a fact with which a customer is sufficiently familiar. To require a storekeeper to keep a floor completely dry during a rainstorm or to hold him responsible for every slick place due to tracked-in rain water would impose an unreasonable standard of care and would, in effect, make him an insurer of the customer's safety. Of course, each case must be examined in light of its particular circumstances, and where there are unusual accumulations of rain water or other circumstances, due care may require that the storekeeper take affirmative measures such as mopping, applying anti-slip compounds, or posting warnings.

*Terrell v. Warehouse Groceries*, 364 So. 2d 675, 677 (Ala. 1978); *see also McDonald's Corp. v. Grissom*, 402 So. 2d 953, 955 (Ala. 1981) (recognizing that a landowner's duty to a business invitee to exercise ordinary and reasonable care to keep the premises in a reasonably safe condition, "does not require a storekeeper to keep a floor completely dry during rainstorms.").

Thus, invitees, as a matter of law, are charged with the knowledge that during and after rainstorms the entranceways of businesses, like Dollar General, are more slippery than they otherwise would be. "'Everybody knows that the

hallways between the outside doors of such buildings and the elevators or business counters inside the building during a continued rain storm are tracked all over by the wet feet of people coming from the wet sidewalks, and are thereby rendered more slippery than they otherwise would be. … It is not the duty of persons in control of such buildings to keep a large force of moppers to mop up the rain as fast as it falls or blows in, or is carried in by wet feet or clothing or umbrellas, for several very good reasons, all so obvious that it is wholly unnecessary to mention them here in detail.'" *Gulas, supra*, 216 So.2d at 280 (citation omitted); *see also Terrell, supra*, 364 So. 2d at 677 ("When it rains, surfaces naturally become more slippery than usual a fact with which a customer is sufficiently familiar.").

Alabama's open and obvious doctrine also protects business owners from liability in cases where a floor's condition is known to the plaintiff or should have been known to the plaintiff. In those instances when surfaces become slick because of rainwater and other wet substances, the Alabama Supreme Court recognizes that the property owners are not generally liable for the slippery conditions because reasonable people know, or should know, that rainwater and gasoline, for instance, will cause surfaces to become slick. *See Ex parte Neese,* 819 So.2d 584, 590 (Ala. 2001) (affirming summary judgment where location of door mat coupled with being wet from the rain was obvious to the plaintiff); *Shelton v. Boston Fin., Inc.*, 638 So.2d 824, 825 (Ala. 1994) (affirming summary judgment on finding that a reasonable person would be expected to realize that rain would cause grass to become slippery); *Hines v. Hardy,* 567 So.2d 1283, 1284 (Ala. 1990) (affirming summary judgment because plaintiff knew crosstie was wet from rain and thus, as a matter of law, was on notice of the slippery condition); *Langley v.*

*Bob's Chevron,* 554 So.2d 1024, 1025 (Ala. 1989) (affirming summary judgment because gasoline spill was obvious and known to plaintiff); *Lawson v. Williams,* 514 So.2d 882, 883 (Ala. 1987) (affirming summary judgment because plaintiff should have known that leaves accumulated after rain would probably be wet and slippery).

Under this legal framework, the undisputed facts in Mr. Elrod's case clearly show that he was aware that it had been raining hard at his home and in Orange Beach generally for some period of time before he entered the Dollar General. Based on his previous visit to this new store, he would have been familiar with the fact that this store had smooth concrete floors that could become slippery when wet and that situation is likely to occur on rainy days when customers are tracking in water. In his own experience as a business owner, his practice was to place mats, very similar to those used by Dollar General, down at the entrance to his business in an effort to prevent falls on rainy days. Thus, the placement of mats by Dollar General, coupled with rainy conditions, would provide him with notice of the possibility of a slippery entranceway on this rainy day in August.

When he arrived and parked his car, with his windshield wipers still on because the rain was continuing, he noticed that the parking lot was wet but did not notice or step in any puddles of water. After this short walk across a wet parking lot in sandals, he walked under an awning to enter the store without noticing any accumulations of water on two mats, one rubber mat placed just outside the entranceway and one cloth mat lying just inside the store. These mats and their condition were unobstructed from Mr. Elrod's view. As clearly seen from the video evidence presented by Mr. Elrod, he never hesitated as he

crossed the mats to wipe his feet or to check for water accumulation. His own testimony was that he felt safe at the time and did not see a need to wipe his feet or otherwise check the mats and floor. Instead, he stepped off the second mat onto a slippery floor and fell. This was so even though his right knee was still on the mend from surgery and still painful enough to cause a slight limp.

It was only after his fall that he noticed water on the mat and the floor and realized that he had water on the back of his calf. The inference from his testimony was that a substantial amount of water had accumulated on the mat, so much that some had run off the mat and created two puddles of water he estimated to have a total size of between 12 and 16 inches. He opined that the water that had accumulated on the mat caused him to fall. Although no direct evidence was presented as to how this amount of water accumulated on the inside mat and the surrounding floor, the inference from the evidence presented was that it came from rainwater that was tracked in during the flow of customers entering the store between 8 a.m. and time Plaintiff fell, approximately 11 a.m. Plaintiff offered no evidence as to why a saturated mat and two puddles of water could not have been discovered or detected by a reasonable survey of the mat and floor upon entry. Certainly, this amount of water should have been obvious to Mr. Elrod before he fell if he had exercised reasonable care by stopping to inspect the mat and floor area in his path prior to stepping off the mat. *See Terrell, supra*, 364 So. 2d at 677 ("When it rains, surfaces naturally become more slippery than usual a fact with which a customer is sufficiently familiar."); *Gulas, supra,* 216 So.2d at 280 ("'Everybody knows that the hallways between the outside doors of such buildings and the elevators or business counters inside the building during a continued rain storm are tracked all over by the wet feet of

people coming from the wet sidewalks, and are thereby rendered more slippery than they otherwise would be.'" (citation omitted)).

The evidence presented in this case overwhelming supports a finding that the hazard faced by Mr. Elrod when he entered the General Dollar Store was open and obvious as a matter of law. This was an ordinary risk attendant to customers entering businesses on rainy days. It is reasonable to expect customers to take appropriate precautions in such situations. In addition, the evidence does not support a finding that the defendant had any superior knowledge of the hazard alleged to have caused the fall. Thus, there is no legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff on the issue of whether the defendant owed a duty of due care since the hazard was open and obvious and clearly one that could have been detected by the plaintiff in the exercise of reasonable care.

**C. PROXIMATE CAUSATION**

Although not a basis for granting the motion for a judgment as a matter of law, the Court notes another evidentiary problem that would have the potential for undermining any jury verdict on behalf of the Plaintiff. The expert testimony regarding causation does not appear to be reliable and the opinions expressed by the experts are not supported by sufficient evidence.[6]

A negligence claim under Alabama law has four elements: duty, breach, causation, and damages. *Palmer v. Infosys Techs. Ltd, Inc.*, 888 F. Supp. 2d 1248, 1255 (M.D. Ala. 2012) (citing *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So.2d 665, 679 (Ala. 2001)). Plaintiffs bringing negligence claims must show

[6] These issues were not raised or argued by the parties.

breach of duty and causation. *See e.g.*, *QORE, Inc. v. Bradford Bldg. Co., Inc.*, 25 So. 3d 1116, 1123 (Ala. 2009) ("'In a negligence action the plaintiff must prove (1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury.'")

In this action, Plaintiff presented expert opinions from two treating orthopedic surgeons on the issue of the proximate cause of Plaintiff's injuries for which he was treated. First, Dr. Martin testified that the torn menisci and torn ACL that she repaired were caused by the trauma to the knee, which was directly related to Plaintiff's fall in August 2013. The data she used to make this decision was incomplete, however. She did not know about Plaintiff's prior injury to his knee, i.e., torn menisci, and about the arthritic changes identified in 2010. Second, Dr. Tessier testified that he believed that the Plaintiff's need for a total knee replacement in 2015 might have been made necessary, in part, because of the trauma suffered in August 2013. Even so, he was not able to form a clear opinion as to what part the fall played in creating a need for surgical intervention in 2015. He did not have a full medical history and he had not reviewed patient records from the first surgery performed by Dr. Martin.

Under these circumstances, the opinions were subject to attack and/or insufficient to support a viable verdict for a couple of reasons. First, the medical opinions as to causation suffer from a lack of sufficient facts and data, i.e., a proper foundation, which rendered the method for reaching their conclusion unreliable.

> Rule 702 provides that a witness with the requisite "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if: (a) the witness possesses "scientific,

> technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact at issue; (b) "the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." These requirements help ensure that any expert testimony presented at a jury trial is relevant, reliable, and supported on "good grounds." *See Daubert* [*v. Merrell Dow Pharms., Inc.*], 509 U.S. [579], 589–90, [113 S.Ct. 2786, 125 L. Ed. 2d.469 (1993)]. Further, under *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the court must ensure that expert witnesses present "in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the field."

*Carmody v. State Farm Mut. Automotive Ins. Co.,* No. 6:14-cv-830-Orl-37KRS, 2015 WL 5542534, at *2, (M. D. Fla., Sept. 18, 2015). It is not unusual for courts in this Circuit to exclude causation opinion testimony when, for various reasons, those opinions fail to consider other possible causes for a medical condition, many times because the experts rely too heavily on their patients' accounts of the facts. *Id*. at *3; *see also Bowers v. Norfolk S. Corp.*, 537 F.Supp.2d 1343, 1366 (M.D. Ga. 2007) (rejecting causation opinion of physician which was based on an incomplete medical history), *aff'd,* 300 Fed.Appx. 700 (11th Cir. Nov. 18, 2008).

Specifically, the doctors in this case were not provided with a complete medical history that could have rendered their causation opinions inadmissible if a proper motion had been filed or if the Court had recognized that the Plaintiff had failed to provide Drs. Martin and Tessier with this information. Three years before the fall, Plaintiff went to an orthopedic surgeon complaining of pain in his left knee. After an MRI revealed tears in menisci and arthritis, he was tentatively scheduled for surgery on that knee. This is significant evidence of preexisting conditions that should have been part of the doctors' analyses as to why both surgeries were necessary.

And secondly, since Plaintiff readily agreed that because of his preexisting

conditions the jury should only award him damages for the injuries caused by his fall in the store, it was incumbent on the Plaintiff to provide sufficient evidence from which the jury could distinguish between pre-fall and post-fall conditions of the knee. On this significant issue, he failed to provide any expert evidence as to the degree of injury caused by the fall in consideration of the preexisting conditions of torn menisci and arthritic changes. Since such a complicated determination of the extent of injury caused by the fall, including the exacerbation and/or acceleration of preexisting conditions, is one not within the common knowledge of most jurors, the information that was to be submitted to the jury does not appear to provide a sufficient evidentiary basis upon which to reach a supportable verdict. Plaintiff specifically testified that he was not asking for compensation for a preexisting condition—i.e., meniscus tears with arthritis—but only wanted the jury to compensate him for the injury proximately caused by the fall. Given the lack of expert testimony that could have provided the jurors with a basis to determine the extent of damage to the knee between 2010 and 2013, and the impact those conditions clearly had on the need for surgical intervention, it seems that the jury would have been required to engage in speculation on several issues: the nature and extent of his preexisting conditions, the impact his fall had on those conditions, and the relationship between the total knee replacement surgery and the fall since he had undergone a repair of the knee in the interim and it appears that the main need for the knee replacement had to do more with his arthritic condition as opposed to the fall.

## III. CONCLUSION

For the reasons stated above, the Court finds that Plaintiff failed to present a legally sufficient evidentiary basis for a reasonable jury to find for him on the

issue of whether the defendant owed a duty of due care to Plaintiff on the day of his fall. Defendant's motion for a judgment as a matter of law is **GRANTED**. A final judgment shall be entered by separate order.

**DONE** and **ORDERED** this the 9th day of February 2017.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**